1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE MARIANA R. PFAELZER, U.S. DISTRICT JUDGE

4                          - - -

5

KELLY CARTER,                      )
6                        PLAINTIFF,    )
          vs.                        ) No. CV08-00334-MRP(JCRx)
7  NOVARTIS CONSUMER HEALTH, INC.,   )
                         DEFENDANT,    )
8  _____)
ERIK OSTERGARD,                    )
9                        PLAINTIFF,    )
          vs.                        ) No. CV08-1817-MRP(JCRx)
10  WYETH, ET AL.,                    )
                         DEFENDANTS,   )
11  _____)
ERIK OSTERGARD,                    )
12                        PLAINTIFF,    )
          vs.                        ) No. CV08-2574-MRP(JCRx)
13  ADAMS RESPIRATORY THERAPEUTICS,   )
ET AL.,                            )
14                       DEFENDANTS,   )
   _____)
15  KIRBY KOTLER,                     )
                          PLAINTIFF,   )
16          vs.                        ) No. CV08-3023-MRP(JCRx)
JOHNSON & JOHNSON, ET AL.,         )
17                       DEFENDANTS,   )
   _____)

18

19             REPORTER'S TRANSCRIPT OF PROCEEDINGS

20                  LOS ANGELES, CALIFORNIA

21                  MONDAY, JULY 28, 2008

22        _____

23             CINDY L. NIRENBERG, CSR 5059
                U.S. Official Court Reporter
24             312 North Spring Street, #438
                Los Angeles, California 90012
25                *www.cindynirenberg.com*

```
1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFFS:
                         STRANGE & CARPENTER
4                        BY: BRIAN R. STRANGE, ATTORNEY AT LAW
                         12100 WILSHIRE BOULEVARD
5                        19TH FLOOR
                         LOS ANGELES, CA 90025
6                        310-207-5055

7

8    FOR THE DEFENDANTS:
                         BAKER BOTTS
                         BY: EARL B. AUSTIN, ATTORNEY AT LAW
9                        2001 ROSS AVENUE
                         DALLAS, TX 75201
10                       214-953-6542

11                       NELSON MULLINS RILEY & SCARBOROUGH
                         BY: JAMES F. ROGERS, ATTORNEY AT LAW
12                       1320 MAIN STREET
                         17TH FLOOR
13                       COLUMBIA, SC 29201
                         803-255-9489

14
                         COVINGTON & BURLING
15                       BY: SIMON J. FRANKEL, ATTORNEY AT LAW
                         ONE FRONT STREET
16                       SAN FRANCISCO, CA 94111
                         415-591-6000

17
                         SIDLEY AUSTIN
18                       BY: THOMAS P. HANRAHAN, ATTORNEY AT LAW
                         555 WEST 5TH STREET
19                       SUITE 4000
                         LOS ANGELES, CA 90013-1010
20                       213-896-6000

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          LOS ANGELES, CALIFORNIA; MONDAY, JULY 28, 2008

 2                         10:08 A.M.

 3                         - - - - -

 4          THE CLERK:  Calling Item Number 1, Case Number

 5  08-0334, Kelly Carter versus Novartis Pharmaceuticals; Case

 6  Number 08-1817, Ostergard versus Wyeth, et al.; Case Number

 7  08-2574, Erik Ostergard versus Adams Respiratory Therapeutics,

 8  Inc., et al.; and Case Number 08-3023, Kirby Kotler versus

 9  Johnson & Johnson, et al.

10          Counsel, state your appearances, please.

11          MR. STRANGE:  Good morning, Your Honor.  Brian

12  Strange for the plaintiffs in all cases.

13          MR. AUSTIN:  Good morning.  Earl Austin for the

14  defendant Novartis Consumer Health.

15          MR. ROGERS:  Good morning, Your Honor.  I'm Jim

16  Rogers from Columbia, South Carolina, admitted pro hac vice,

17  and I represent Wyeth.

18          MR. HANRAHAN:  Good morning, Your Honor.  Thomas

19  Hanrahan for McNeil in the Kotler case.

20          MR. FRANKEL:  Good morning, Your Honor.  Simon

21  Frankel of Covington & Burling for the Adams Respiratory

22  Therapeutic and Reckitt Benckiser defendants.  Thank you.

23          THE COURT:  Well, I understand that there has to be

24  an allocation of who's going to speak first, and Mr. Austin is

25  going to speak first?  You are?
```

```
 1                    MR. AUSTIN:  That's correct, Your Honor.  May I
 2    proceed?
 3                    THE COURT:  Yes, please.
 4                    MR. AUSTIN:  Good morning.  As I noted, I represent
 5    Novartis Consumer Health in the Carter case.
 6                    THE COURT:  Yes.
 7                    MR. AUSTIN:  I'll take the lead.  There may be
 8    circumstances where either through a question or some issue
 9    that relates to their products or their cases, other defense
10    counsel may wish to chime in.  You won't get four speeches.  We
11    are not going to be repetitive, and I will take the lead, I
12    think, for the defendants.
13                    The plaintiffs' claims here we believe are very
14    simple claims.  They are very -- they're staggering in their
15    breadth, but we think they are very simple.
16                    They seek economic and injunctive relief under
17    various state consumer fraud statutes based on the allegation
18    that our clients' products, over-the-counter cough/cold
19    medications, are not safe and not effective for children.
20                    Each of our products, as we spelled out in our brief,
21    has been specifically approved by the FDA as safe and
22    effective, including for children.
23                    THE COURT:  Yes.
24                    MR. AUSTIN:  I won't go through the -- we've detailed
25    the process, the OTC monograph process, that covers some of our
```

1    products which ultimately results in a federal regulation

2    spelling out both the approval and the conditions under which

3    the products may be used and labeled and the populations of --

4    the indications of people who can use them.

5            That's done by hearing and notice, a several-year

6    process with consultation with advisory committees and

7    ultimately results in a federal regulation spelling out the

8    terms under which our products may be used, including in

9    children.

10           Other of the defendants' products have been approved

11   pursuant to the new drug application process which is a

12   specific review of each of the products.

13           THE COURT:  I'm quite familiar with that.

14           MR. AUSTIN:  All right.  The point is each of our

15   products would not be on the market but for the FDA's finding

16   expressing they are safe and effective.

17           THE COURT:  No, I know that.

18           MR. AUSTIN:  We believe that the plaintiffs here do

19   not contend that there's been any violation of the FDA

20   regulations or that the products are being marketed in

21   violation of any FDA regulation.

22           They don't contend that there's been any injury here.

23   They affirmatively disclaim any claim for personal injury.

24   This is strictly a claim for purely economic loss, benefit of

25   the bargain damages.

```
 1            THE COURT:  But I'm not sure I know what that

 2   economic loss is.  Is that the price of the product?

 3            MR. AUSTIN:  As best we can tell, that's it, Your

 4   Honor.

 5            Simply, the allegation reduced, as we view it -- and

 6   I'd like -- I certainly would love to hear from Mr. Strange,

 7   but our interpretation is -- reduced to a nutshell, is

 8   plaintiffs say that under state law, they can challenge the

 9   safety and efficacy of the products not withstanding the FDA

10   finding to the contrary and get their money back as a class

11   without any proof of any individual harm or any individual

12   injury.

13            And we think that is just flatly preempted.  We think

14   this is a classic case of preemption where the FDA has via

15   either regulation on the one hand or by the NDA process on the

16   other made a specific determination that the products are safe

17   and effective for children.

18            THE COURT:  Your client is not an NDA problem.

19            MR. AUSTIN:  My client is -- all of its products were

20   under the OTC monograph process.

21            THE COURT:  Right.

22            MR. AUSTIN:  Certainly, I think we have -- first up,

23   I think, as an expressed preemption, we also -- and I can talk

24   about implied preemption, but I really think the key here is

25   expressed preemption.  We have a statute which makes this case
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    different from the prescription drug cases.

2              Our statute is even different and we think more --

3              THE COURT:  Yes, I was interested in yours.

4              MR. AUSTIN:  The highlights to me are that it says,

5    "No state or political subdivision of a state may establish or

6    continue in effect any requirement that relates to the

7    regulation of..." an OTC drug, "and that is different from, or

8    in addition to or that is otherwise not identical with, a

9    requirement under..." the FDCA.

10             THE COURT:  Yes, I know.  Now, let's not any of us do

11   it again.

12             MR. AUSTIN:  All right.  Well, I think there are --

13   two other provisions of the statute that we do think are

14   important is that there is a specific section entitled Safety

15   and Effectiveness, and it provides that -- a requirement for

16   the purposes of the preemption section is one that relates to

17   "...the regulation of a drug shall be deemed to include any

18   requirement relating to public information or any other form of

19   public communication relating to a warning of any kind for a

20   drug."

21             We believe this makes the FDA the arbiter of the

22   safety and efficacy of over-the-counter drugs and makes it --

23   and defines as a state requirement that's preempted, anything

24   that -- any public communication, anything that relates to a --

25   any public communication relating to the safety or
```

1    effectiveness of these products.

2            Finally, there is one last provision -- I think it's

3    worth noting -- is that it provides an exemption that a state

4    may apply for an exemption to the secretary, and after notice

5    and hearing, that exemption, if the FDA agrees, can be adopted

6    in a regulation.

7            And one of the areas where they can apply is an area

8    that would protect an important interest that would not

9    otherwise be protected, including the health and safety of

10   children.

11           So the statute actually provides that if a state

12   believes that there is not adequate protection of children

13   under the existing regulations, they can apply to the agency

14   for an exemption, and after writ, notice and hearing, if the

15   FDA agrees, it will be a regulation to that effect.

16           THE COURT:  That hasn't happened.

17           MR. AUSTIN:  That hasn't happened here.

18           But we think it illustrates that the statute here is

19   clearly intended to make the FDA the arbiter on the safety and

20   efficacy of these products, including for children, and

21   provides a mechanism that a state can pursue, if it chooses,

22   but it preempts state tort law claims, that there is a savings

23   clause -- and let me just turn directly to what I think are the

24   plaintiffs' main arguments.

25           They first argue that somehow they're not -- their

1    state law claims would not constitute requirements under the

2    statute.

3            They make that claim without even citing the Riegel

4    case, which is the United States Supreme Court's opinion from

5    just this year.  I think it's misleading to discuss this issue

6    without discussing Riegel.

7            Riegel makes it clear that any common law claim, any

8    common law duty, is a requirement for the purposes of

9    preemption statutes.

10           And the Court made it clear that congress deserves

11   some comfort, some consistency from the Court in knowing what a

12   requirement is.  And they held that absent some other

13   indication, reference to a state's requirements includes common

14   law duties.  I mean, that's the law from Riegel.

15           Our statute makes it even clearer because it

16   specifically says with regard to safety and effectiveness, any

17   requirement is any public communication, anything that would

18   affect a public communication relating to any warning for our

19   products.

20           We've cited the Kanter case in California followed by

21   the Berenguer in Florida and Mills cases in Texas.  They are

22   certainly the leading cases addressing -- maybe the only cases

23   addressing our statute, Section 379r, in this particular

24   context, purely economic loss.

25           We think the analysis in those cases is instructive

1    here and is sound and provides clear guidance for this Court on

2    how that statute should be applied in this particular instance

3    being a purely economic loss case.

4            The plaintiffs also cite the savings clause.  There

5    is a savings clause in the 379r.  It says, "Nothing in this

6    section shall be construed to modify or otherwise affect any

7    action or the liability of any person under the product

8    liability law of any state."

9            We think that product liability law has a very clear

10   meaning.  We've cited the definitions in the various states

11   that are at issue here, predominantly New Jersey.

12           The restatement of torts defines product liability as

13   being an action involving an injury to person or property.

14   That's an accepted definition that's applied throughout the

15   state.

16           Certainly, the restatement has influenced state

17   statutes and state common law, and we've cited the case law and

18   the guiding statutory law from all of the states that are at

19   issue here.

20           All of them require -- are consistent in requiring

21   that the foundation of a product liability claim is a claim for

22   injury to person or property.  We don't have that here.  This

23   is a purely economic damage claim.

24           In fact, the New Jersey statute makes that

25   distinction quite clearly and puts product liability claims

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    outside the ambit of the --

 2           THE COURT:  Well, I don't understand that the product

 3    was used, do you?

 4           MR. AUSTIN:  There's no allegation to that effect.

 5           There's an allegation that it was purchased.  There's

 6    no allegation that it wasn't -- there's not even an allegation

 7    that it didn't work.  I mean, there's no allegation here that

 8    any plaintiff took the product, was injured or that it didn't

 9    work for them.  There's just simply the allegation that it was

10    purchased.

11           THE COURT:  Well, I'll tell you one other thing that

12    I'm perplexed about.  I'm perplexed about when it was bought

13    and what the buyer of it knew.

14           MR. AUSTIN:  I think there are allegations -- and it

15    will vary from complaint to complaint.  My recollection is that

16    in the Novartis complaint -- it was early 2007, I think, was

17    the allegation.  It may vary from complaint to complaint.

18           There is no allegation at all in any of the

19    complaints about what the buyer knew, what their expectation

20    was, what they reviewed.  There is certainly no allegation that

21    they saw some advertising or anything of that nature.

22           And we had moved under 9(b) to invite the plaintiffs

23    to flesh out their allegations in that regard, and they really

24    came back, planted both feet on the ground, and said, "We are

25    simply arguing that we can under state law say you defendants
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    can be liable because you didn't say the products are unsafe

2    and ineffective," notwithstanding the FDA finding to the

3    contrary.

4            Really, at the end of the day, we think the

5    over-breadth of their claim makes this a fairly narrow issue.

6    This is a purely economic damage case where the plaintiffs seek

7    under state law to directly challenge the finding of the FDA on

8    safety and efficacy.

9            There is really no subtly or nuance to this.  We are

10   not around the edges here.  They, in effect, say that under

11   state law, they can hold our clients liable for simply selling

12   a product that the FDA has said we can sell.

13           We have a license from the FDA to sell this product.

14   The states can't limit that, and the plaintiffs can't, by an

15   economic loss claim, do the same thing.

16           Unless the Court has any questions, I've really

17   covered what I intend to cover.

18           THE COURT:  Oh, no, that's adequate.

19           MR. AUSTIN:  Thank you.

20           THE COURT:  Please.  Whoever is next going to --

21           MR. AUSTIN:  I believe that my colleagues have

22   indicated that for now they're content.

23           THE COURT:  Fine.  Then let's hear from the

24   plaintiff.

25           MR. STRANGE:  Thank you, Your Honor.  Brian Strange

1    for the plaintiffs.

2            Your Honor, the case before us concerns purchase of a

3    drug for children which we are contending that defendants knew

4    did not work and was, in fact, dangerous, and that they

5    continued to promote its sale to children until the FDA in

6    October of '07 found the information that they already knew

7    about and issued an order.

8            The defendants then voluntarily withdrew it and the

9    FDA later in 2008 ruled that, in fact, the medicine for

10   children under two was dangerous and should not be used.

11           THE COURT:  None of your plaintiffs have children

12   under two?  Or have you got a child under two?

13           MR. STRANGE:  I only have Mr. Kotler's complaint in

14   front of me, and he had a four year old, Your Honor, but I can

15   check as to the other ones.

16           And responding to Your Honor's comments with respect

17   to Mr. Kotler, we allege in Paragraph 7 that he purchased the

18   over-the-counter medicine in October of 2007 for his

19   four-year-old daughter, and that he gave the medication to his

20   daughter.

21           THE COURT:  Well, I'm just a little uncertain.  Did

22   he buy it knowing about the warning or knowing that it wasn't

23   supposed to be good for people -- for children under two or

24   under six?

25           MR. STRANGE:  Your Honor, we haven't done the best

```
 1    job of alleging what he knew, but I think the clear

 2    implication -- and we can clear this up -- is that he purchased

 3    the drug based on what he understood from the defendants'

 4    advertising and from the label that it was, in fact, safe and

 5    effective for children, including his four-year-old daughter.

 6            THE COURT:  Well, what I'm asking you is had he

 7    already read that it might be dangerous?

 8            MR. STRANGE:  No, Your Honor.

 9            THE COURT:  No.  Well, that's not clear from the

10    complaint.

11            MR. STRANGE:  I apologize, Your Honor.  And I can --

12            THE COURT:  And he relied on what was on the label or

13    in the advertising?

14            MR. STRANGE:  Yes, Your Honor.

15            THE COURT:  Go on.

16            MR. STRANGE:  So the essence of the defendants'

17    arguments is that since their label was approved in 1974 or

18    thereabouts, that they're immune from any lawsuit regarding

19    this drug which was dangerous and, in fact, didn't work.

20            THE COURT:  Oh, I don't think they say that.  They

21    didn't say they were immune.  They said that they were exempt

22    from liability unless it was product liability.

23            MR. STRANGE:  They would be -- let me rephrase that,

24    Your Honor, that basically they would be allowed to promote

25    this drug and to profit from it and they could not be sued for
```

```
 1    unfair business practices unless it involved a personal injury.

 2    Because the effect of a preemption here, Your Honor, is that

 3    there's no remedy for consumers that bought this drug thinking

 4    it was safe and effective.

 5           THE COURT:  Well, what's the remedy you're seeking?

 6           MR. STRANGE:  The remedy we're seeking is the value

 7    of the product that they purchased which was zero.  They paid

 8    money for a product which, in fact, did not work.

 9           THE COURT:  Well, now, what you want is the price?

10           MR. STRANGE:  Yes, Your Honor.

11           THE COURT:  Hmm.  Go on.

12           MR. STRANGE:  But the troublesome issue here, as far

13    as I'm concerned, Your Honor, is that if we have a situation

14    where the manufacturer of a drug knows that the drug is

15    ineffective and, in fact, is dangerous but they continue to

16    promote it to children, they're saying that they will be

17    allowed to profit on that.  They may pay for the personal

18    injury claims, but they can participate in this market, which

19    was a $2 billion market, with no consequences.

20           And, in other words, do they have some kind of duty

21    to the consumer or anybody to say, "By the way, this drug that

22    we're selling doesn't work for your child, and, in fact, may

23    hurt them."  Is there any obligation on their behalf?

24           And, Your Honor, I filed -- on Friday, I had a case

25    sent to me from Indiana.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  The Paxil case?

2          MR. STRANGE:  Yes, Your Honor.

3          THE COURT:  Well, I just have one Paxil case left

4   from about a thousand, but I did not take the suicide cases.

5          MR. STRANGE:  Right.

6          THE COURT:  And so this is one of the suicide cases;

7   is that right?

8          MR. STRANGE:  This is the case that I sent you, yes.

9          But the relevancy, Your Honor -- the relevancy I

10  thought of that case, the Tucker case, was that the Court held

11  under the CFR statutes that a drug manufacturer has a duty to

12  supplement its label if it finds there is reasonable evidence

13  of an association of a serious hazard with a drug.

14          So you have a situation where the defendants are

15  saying here that plaintiffs are not contending there is a

16  violation of the federal statutes when, in fact, I think if we

17  amended, we could allege that because this is exactly one of

18  the duties that I'm talking about.  And the Court in Tucker

19  basically on a reconsideration said if the manufacturer of

20  Paxil knew that there was a problem with this drug, even if the

21  FDA didn't tell them to, they have an obligation to supplement

22  their label.

23          So I think that's relevant as to whether there is a

24  duty here when a defendant manufacturer knows that there is a

25  problem with the drug that they're promoting, particularly with

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   children.
 2            So that in and of itself deals with a lot of the
 3   issues raised by the defendants here.  But I just thought I
 4   would just briefly go through some of the issues before Your
 5   Honor which is that, first of all, with respect to the
 6   presumption against preemption, the defendants have argued that
 7   there is no presumption in an expressed preemption case, but
 8   the only authority that they cite is the recent case by the
 9   Supreme Court, Medtronic, but that case didn't hold that.
10            The majority didn't discuss the issue, granted, but
11   clearly the dissenting opinion raised the issue, and it's been
12   raised in all previous Supreme Court -- many Supreme Court
13   cases that we've cited in our papers.
14            So just to start off, from the analysis, I think
15   there is a presumption against preemption, particularly when
16   you are dealing with the health and safety of citizens.
17            So once you begin with that presumption, then I think
18   we go to whether there is a requirement here.
19            THE COURT:  A requirement of what?
20            MR. STRANGE:  Well, the expressed preemption argued
21   by the defendant is that no state can impose a requirement
22   that's in addition to or in conflict with the FDA regulation.
23            That's the basis of their argument.
24            And there's been some give and take in the cases on
25   whether a state claim for damages is a requirement, but one
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    thing that's been pretty constant in the Supreme Court cases is

2    that a state law damage claim is -- that merely supplements the

3    federal regulations is not a -- is a parallel.

4            THE COURT:  You mean a product liability claim?

5            MR. STRANGE:  No, Your Honor.  It's not limited to

6    product liability claims in that instance.

7            I'm going to get into the savings clause in a minute,

8    but just in the expressed preemption clause -- like, for

9    example, in the cigarette manufacturing case by the U.S.

10   Supreme Court, Cipollone, where the Court found no preemption,

11   which was not overruled by the recent Medtronic case, the Court

12   there, for example, said that -- and there, there was an

13   expressed statute regarding cigarette advertising, and the

14   Court -- the Supreme Court said, "Well, first of all, if the

15   defendant cigarette manufacturer makes warranties, those

16   warranties by the manufacturer," as we've alleged here, "are

17   not a state requirement.  The source of that warranty is the

18   manufacturer.  They are the ones making the warranty."  And

19   that was not -- it was expressly held by the Supreme Court in

20   the Cipollone case and held by many courts in this district.

21           So, first of all, the warranty claims that we're

22   alleging are not preempted by the expressed preemption clause

23   because the warranty claims are not a state requirement.

24           Second, Your Honor, with respect to the other

25   arguments is that the Supreme Court has held that -- and, by

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    the way, with respect to that issue, Your Honor, quoting from

 2    the Supreme Court case in Cipollone, the Court said,

 3    "Accordingly, the requirements imposed by an expressed warranty

 4    claim are not imposed under state law, but rather imposed by

 5    the warrantor."

 6            So, anyway, with respect to the additional arguments,

 7    Your Honor, when we're dealing with express preemption, the

 8    U.S. Supreme Court has said that damage claims that are merely

 9    parallel to -- you know, that help assist the manufacturer in

10    complying with those requirements are not preempted.

11            So, for example, we have a situation where we're

12    saying this manufacturer had a duty to tell someone when they

13    found out that this drug was dangerous and didn't work.  And

14    the fact that we have --

15            THE COURT:  Well, they do report to the FDA all the

16    time.

17            MR. STRANGE:  Right, but they didn't say anything to

18    the FDA.

19            The only thing that happened was when the FDA filing

20    found out what these defendants knew all along, the FDA pulled

21    the drug.  Actually, the FDA issued a warning and then

22    defendants voluntarily pulled their drug in '07.

23            THE COURT:  The FDA did not require them to pull the

24    drug as to all children under six.

25            MR. STRANGE:  That's correct, Your Honor.

```
1              THE COURT:  Right?

2              MR. STRANGE:  That's correct.

3              THE COURT:  Did not?

4              MR. STRANGE:  Did not.  It has not --

5              THE COURT:  It looked at it.

6              MR. STRANGE:  It has not issued a ruling on that

7    issue.  It has expressly reserved --

8              THE COURT:  They haven't done that.

9              MR. STRANGE:  They have not done that yet, Your

10   Honor, but I think that the status of the issue on the under

11   six is that they're still investigating it.

12             THE COURT:  Well, I don't know what I can do with

13   that.

14             MR. STRANGE:  Even with respect to the drug for

15   children under six, we're alleging that those drugs, too, were

16   ineffective and, in fact, dangerous.  And the defendant is

17   saying, "Well, even if they are, we're not liable because the

18   FDA approved our label."

19             And, you know, our response is that if they knew --

20   if they know about this being -- I mean, the only way that the

21   FDA, unless they're doing independent research, you know, is

22   informed about problems with these drugs, is if somebody tells

23   them.  And we think the statute --

24             THE COURT:  But people tell them all the time.

25             MR. STRANGE:  I understand.  But with respect to the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   Tucker case, Your Honor, that we have cited and the statute

 2   there, we think the defendant --

 3          THE COURT:  What happened here?  What's the plaintiff

 4   alleging about suicide?  Did someone actually kill themselves,

 5   is it alleged, because of taking Paxil?

 6          MR. STRANGE:  In the Tucker case, I believe that's

 7   true.

 8          THE COURT:  Yes.  Well -- and there are a number of

 9   those cases that survived.  That's a personal injury case.

10          MR. STRANGE:  Yes, Your Honor.

11          There's also a case that I'm handling against Paxil

12   for getting our money back, which has been settled, but it's

13   the same issue as before Your Honor, not that, you know, I'm

14   citing that as authority.

15          THE COURT:  The case that's in front of this Court?

16   That one?

17          MR. STRANGE:  No, Your Honor.  This was a case that

18   was currently approved in Madison County, and then we have

19   another settlement pending in Minnesota federal court, and that

20   is with respect to obtaining the money back from the sale of

21   Paxil when the defendants knew it was dangerous and didn't

22   work.

23          THE COURT:  Go on.

24          MR. STRANGE:  So with respect to the expressed

25   warranty, we think that the warranties by the defendant are not

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    state requirements and, therefore, not expressly preempted, and

2    that the additional damage claims are merely parallel to these

3    requirements and not in addition to the FDA requirements.

4            THE COURT:  What do you mean when you say additional

5    damage claims?

6            MR. STRANGE:  Well, I meant our damage claims, our

7    claims for the money back.

8            THE COURT:  Oh.

9            MR. STRANGE:  And what I meant was that in the

10   express statute, it says that state requirements that are in

11   addition to the federal requirements are preempted.

12           And I would note that in the recent Supreme Court

13   case of Medtronic, the Court, of course, did not disprove --

14   that's in the Riegel case.  The Court did not disprove the

15   Cipollone case and others, but, in fact, it said in that

16   case -- the Riegel versus Medtronic, it says that, "The statute

17   did not prevent a state from providing a damage remedy from

18   claims based on a violation of FDA regulations."

19           But I would also note that that case, the Riegel

20   case, discussed prior Supreme Court cases and made the

21   following comment, which I think is relevant to Your Honor's

22   analysis -- and, again, this is in the Riegel case.  It said,

23   "Unlike general labeling duties" -- and then it goes on to talk

24   about the medical device approval process.  So, here, what the

25   defendants are hanging their hat on is saying, "Well, our label

1    is approved and, therefore, we can market this drug even if we

2    knew it was dangerous and even if we knew it didn't work."

3           And then with respect to the -- so that's the

4    expressed warranty, Your Honor.

5           With respect to the argument about the savings

6    clause, which is the product liability case, we recognize the

7    Kanter case in California said, well, product liability you

8    have to have personal injury, but we've cited numerous

9    authority which we think makes sense that product liability

10   includes warranty claims which don't require personal injury.

11          And, you know, that's really the state of the law.

12   But we believe that that's the better analysis because it

13   doesn't, frankly, make sense that a defendant could --

14          THE COURT:  In that context, product liability

15   includes warranty?

16          MR. STRANGE:  Yes.  We've cited to authority in our

17   papers on that issue, Your Honor, that basically product

18   liability is broken down to strict liability, to negligence and

19   to warranty.

20          Now, there is certainly contrary decisions, but we

21   think that that analysis makes more sense because it doesn't,

22   frankly, make a lot of sense that a defendant can sell a drug

23   that's dangerous and ineffective and say, "Well, we can profit

24   from the sale of this drug, and we can make, you know, billions

25   of dollars, but we'll pay if someone gets hurt.  We'll be

1   liable if someone gets hurt, but we get the benefit -- we can't

2   be sued for all the money we're making."

3           So if you look at it that way, then if you look at

4   what is a products liability lawsuit, we've cited to authority

5   that says products liability -- excuse me for a minute, Your

6   Honor, I apologize -- includes warranty claims.  And we've

7   cited to a California case that said to state a breach of

8   warranty, the plaintiff must allege injury, damage, loss or

9   harm.

10          Then we cited the Blacks Law Dictionary that says,

11   "Products liability can be based on a theory of negligence,

12   strict liability or a breach of warranty."

13          So this case -- this argument -- the whole argument

14   of the defendants can be similarly disposed of if we find that

15   products liability includes a breach of warranty, as Blacks Law

16   Dictionary says it does, because we have a savings clause.

17          THE COURT:  Because what?

18          MR. STRANGE:  We have a savings clause.

19          The very statute that they're relying on says, "We

20   are not immune."

21          THE COURT:  Well, that really is your whole argument,

22   that product liability includes warranty.

23          MR. STRANGE:  I don't think it's my whole argument,

24   Your Honor, and I think it's only a small part of the argument

25   because the first argument would be we don't even have to get

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to the savings clause because under the Supreme Court decision

2    in Cipollone, an expressed warranty is not a requirement by a

3    state, and, therefore, their presumption doesn't come into

4    effect.

5            And then you get to the issue of whether --

6            THE COURT:  Let me say to you that the problem is

7    that you're talking about a regulated field, and the FDA has

8    virtually unlimited regulatory authority that governs labels.

9    Otherwise, how could you ship from one state to the other?  You

10   have different requirements in every state.

11           MR. STRANGE:  I understand, Your Honor, but that's

12   the case in most of these regulated industries, and that was

13   the case when the Supreme Court decided the Lohr versus

14   Medtronic case and the Cipollone versus -- I can't remember the

15   defendant's name -- in that case.

16           So in both of those cases, you had a heavily -- more

17   heavily regulated industry, actually; the medical-devices

18   industry in Medtronic.

19           And there, the Court in the Lohr case found no

20   preemption.  And the reason is because first you start with a

21   presumption against preemption that a state has a right to

22   protect the health and safety of its citizens.

23           And once you get there and you have a strong

24   presumption against preemption, then you look at what's

25   really -- what are plaintiffs claiming and how does their

```
 1   presumption argument --

 2              THE COURT:  And what plaintiffs are claiming is a

 3   warranty --

 4              MR. STRANGE:  In part.

 5              THE COURT:  -- that overrides anything that the FDA

 6   would tell the manufacturer about a label.

 7              MR. STRANGE:  No, Your Honor.

 8              The way that the warranty works here is based on the

 9   advertisements and representations of defendants regarding

10   their products about whether they're --

11              THE COURT:  Well, but FDA has jurisdiction over their

12   advertisements, too.

13              MR. STRANGE:  I understand, but just because they

14   have jurisdiction over them, you -- what the Supreme Court has

15   said in the Cipollone case is if you look at expressed

16   preemption, you have to determine whether there is a state

17   requirement which is somehow in addition to or in conflict with

18   this regulation.  And the Supreme Court in Cipollone said,

19   well, if a defendant makes a warranty, that's not a state

20   requirement.  That's a defendant making a warranty, making a

21   representation, and that's not preempted, and that's squarely

22   held by the Cipollone case.

23              So there is no case that held that those kind of

24   warranties would be preempted here.

25              But, you know, moving on from that, Your Honor, I
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    think it's even stronger because if you have a situation where,

 2    here -- and this is important because it's not really in our

 3    papers as well as it should be -- and it's based on the Tucker

 4    case -- is we are saying that under the federal regulations,

 5    that the defendants had a duty to supplement their label when

 6    they found out that this medicine for children was dangerous

 7    and -- well, basically, was dangerous.

 8            So once you get that duty, Your Honor, then we'd have

 9    to amend our complaint.  But when we are alleging a violation

10    of that duty -- of that statute, then the cases uniformly say

11    that those kind of requirements are not preempted.

12            And the reason that they are not preempted is because

13    they're not imposing something additional on the defendant from

14    the actual requirements by --

15            THE COURT:  Now, you tell me exactly -- let's just

16    take any one of these over-the-counter drugs.

17            MR. STRANGE:  Yes.

18            THE COURT:  When somebody brought to the attention

19    of, let's say, Novartis --

20            MR. STRANGE:  Yes.

21            THE COURT:  -- that it was being said by some doctors

22    or research persons that the over-the-counter drugs were not

23    safe and effective for children under the ages of six or two --

24    you take whichever one you want -- when they found that out,

25    what, tell me, did they have to do specifically?
```

```
 1              MR. STRANGE:  Okay.  First of all --

 2              THE COURT:  Now, don't tell me in generalities.

 3              MR. STRANGE:  Yes, Your Honor.

 4              I'm just looking for the statute, if you would excuse

 5    me.

 6              Under 21 CFR 201.80(e), that when they found out

 7    evidence of an association of a serious hazard with the drug,

 8    that they had a duty to change the label and to tell people.

 9              THE COURT:  Wait.  Wait.  Wait.  You can't change

10    labels willy-nilly without the FDA's consent.

11              MR. STRANGE:  Yes, you can, Your Honor.  And that's

12    my point.

13              THE COURT:  So they should have what?  Tell me what

14    specifically.

15              MR. STRANGE:  What they should have done is they

16    should have told people --

17              THE COURT:  Told who?

18              MR. STRANGE:  Told the consumers who are purchasing

19    the drug.

20              THE COURT:  How?

21              MR. STRANGE:  By changing their label.

22              THE COURT:  No, you are not telling me what they had

23    to do.  They should have called in all the drugs?  That's what

24    I mean.  Specifically tell me what they had to do.

25              MR. STRANGE:  Your Honor, what they had to do under
```

1    the CFR statute I cited is that they had an obligation to

2    change their label to inform the consumer that there was a

3    serious hazard with the drug.

4              THE COURT:  Now, what could they do if they disagreed

5    with that?

6              MR. STRANGE:  If the defendant disagreed with it?

7              THE COURT:  Yes.

8              MR. STRANGE:  Then they can do what they did which is

9    nothing.

10             THE COURT:  No, no.  Tell me every step they had to

11   take.

12             MR. STRANGE:  Well, we're saying under the federal --

13             THE COURT:  First of all, your position is they had

14   to call in everything.

15             MR. STRANGE:  No, that's not my position.  My

16   position is that when the defendant found out that this drug

17   was dangerous, they had an obligation to change their label

18   without going to the FDA.

19             THE COURT:  I'm asking you.  They have -- the product

20   is all around the country on the shelves.  What?

21             MR. STRANGE:  That they had an obligation --

22             THE COURT:  You're not telling me specifically what

23   you would require them to do.

24             MR. STRANGE:  I would require them on a going-forward

25   basis, after they learned about the fact that the drug was

```
 1    dangerous --

 2              THE COURT:  Now, here's the hypothetical.  Novartis

 3    finds out that somebody is saying this about their

 4    over-the-counter cough and cold medicine.  They disagree.

 5    Their people are divided about what they think about this

 6    report.

 7              MR. STRANGE:  Right.

 8              THE COURT:  And at that moment, just that moment,

 9    they have to what?

10              MR. STRANGE:  They have to -- and this is what the

11    Tucker case held, Your Honor, in Paxil -- that they have to

12    either change their label to tell people about the fact that

13    the drug is dangerous or they're going to have -- if it's

14    subsequently found out that they were wrong, they're going to

15    be liable.

16              THE COURT:  They're going to be liable for what?

17              MR. STRANGE:  Well, in this case, they're going to be

18    liable -- if someone dies, they're going to be liable of

19    personal injury.

20              THE COURT:  But you don't have a person that's died.

21              MR. STRANGE:  And here, they're going to be liable

22    for all the profits, all the money they made from selling a

23    drug when they knew it was dangerous.

24              THE COURT:  Well, so court by court, they haven't

25    changed the label because they disagree.  And in a warranty
```

1    case, court by court, they're now going to try the safety and

2    efficiency -- efficacy of these drugs for children under six?

3              MR. STRANGE:  That happens all the time, Your Honor.

4    I mean, that's what the Paxil cases are about.

5              THE COURT:  I know, but nobody's been hurt here.

6              MR. STRANGE:  Well, I mean, a lot of these consumers

7    who have paid a billion dollars for a drug that didn't work

8    have been hurt because they paid for a drug that has zero

9    value.

10             THE COURT:  Well, how do you know what they used it

11   for?

12             MR. STRANGE:  Well, we are alleging they used it --

13   they gave it to their children.

14             Let me back up for a minute, Your Honor.  I know you

15   are struggling with this -- with my theory, but let's look at a

16   normal consumer, as I'm representing here, and they have

17   children, and they have a sick child that has a cough, and --

18             THE COURT:  How old is the child?

19             MR. STRANGE:  Well, in Mr. Kotler's case, it was

20   four.  His daughter was four.

21             And he goes -- and, you know, he's a hardworking guy

22   and goes to the store.

23             THE COURT:  Well, I don't care.  He could be a

24   lay-about and not work, it's all right with me.

25             MR. STRANGE:  Okay.  So he goes to the store

```
 1    concerned about his daughter, and he buys -- he pays --

 2    whatever it was -- ten bucks for a drug thinking that it's safe

 3    and effective and will work for his daughter because that's

 4    what the defendants told him, and the $10 that he paid is

 5    worthless because -- and he's one of millions of people

 6    throughout the country that are paying billions of dollars to

 7    these defendants for drugs that they know don't work.  Not only

 8    that, they know are dangerous.  So do those consumers have a

 9    remedy?  That's the issue.

10            And it's -- like I said, it would not be fair if a

11    consumer can make -- or, I mean, if a drug manufacturer can

12    make billions of dollars from the sale of a product that they

13    know doesn't work and is, in fact, dangerous.

14            And the reason --

15            THE COURT:  Now, did Mr. Kotler give the drug to his

16    child?

17            MR. STRANGE:  Yes, Your Honor.  We've alleged in

18    Paragraph 7 that he gave the drug to his child.

19            THE COURT:  And nothing happened to the child?

20            MR. STRANGE:  Fortunately not.  But as we've cited in

21    our complaint, there was many people that did get serious

22    injuries and there was deaths.  From '96 to 2006, at least a

23    hundred.

24            THE COURT:  But not with your plaintiffs?

25            MR. STRANGE:  No.  We are not seeking personal
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    injury, but we are seeking the money that the defendants made

 2    from selling a drug that they knew didn't work and was, in

 3    fact, dangerous.

 4            How many of these parents are going to buy a drug if

 5    they know it doesn't work and, in fact, may have dangerous

 6    consequences?  There's zero.

 7            So if you have a defendant that knows that, and they

 8    are actively marketing it because it's so lucrative of a

 9    market, and then they come and say, "Well, we didn't have any

10    obligation to tell anybody, even though we knew it didn't work

11    and even though we knew it was dangerous," that's the up-shot

12    of -- their preemption argument is, "Well, we can be sued if we

13    kill someone or hurt someone, but we can't be sued for all the

14    money that we made," and I don't think that that's the law.

15            And Your Honor asked me about their obligations.

16            THE COURT:  No, I didn't.  I said you tell me what

17    they have to do step by step specifically.

18            MR. STRANGE:  Right.

19            THE COURT:  And you haven't done that, but --

20            MR. STRANGE:  Let me try to do that, Your Honor.

21            Under the CFR statute we've cited, they have an

22    obligation, once they know that this drug has a serious hazard,

23    to change their label and inform the consumer of that fact,

24    even if the FDA doesn't tell them to and even if they don't --

25            THE COURT:  Even if the FDA didn't tell them to or
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    even if the FDA had a hearing and didn't tell them to.

 2             MR. STRANGE:  Well, if they had a hearing and didn't

 3    tell them to based on the same information, I'm not sure --

 4    that's kind of a different scenario, and I'd have to look at

 5    that.  But what the Tucker case held, and what I think the

 6    statute provides, is that -- and the Court basically said,

 7    "Look, the FDA may later disapprove of that product change.

 8    The FDA may come in and say 'you know what, manufacturers of

 9    cough syrup, we don't think it's dangerous.  You shouldn't have

10    changed your label.'"  That could happen, and the Tucker case

11    noted that.

12             But what it said is they have a duty -- they have

13    some kind of obligation -- and it stands to reason,

14    respectfully, Your Honor, that if a defendant knows that a

15    child is going to take a drug that's dangerous, they have an

16    obligation to tell someone.

17             Now, they may disagree.  The defendants may say, "You

18    know what, Your Honor and Mr. Strange, we looked at that

19    information.  We don't think it means the drug was dangerous,"

20    but that's what they build courthouses for, and we think that

21    it was dangerous.  And if they didn't change their label or

22    didn't tell anybody when, in fact, it was dangerous, they have

23    an obligation to pay back all the money they made from selling

24    it to people.

25             That's the essence of our lawsuit which is supported
```

```
 1   by the Supreme Court decisions that we've cited.

 2           THE COURT:  All right.  Now --

 3           MR. STRANGE:  Thank you, Your Honor.  Do you have any

 4   more questions of me?

 5           THE COURT:  No, I don't know who it is that is now

 6   going to speak, but --

 7           MR. AUSTIN:  I have just a couple of very brief

 8   points, Your Honor.

 9           THE COURT:  Yes, certainly.

10           MR. AUSTIN:  Really, the core issue here, the

11   conundrum that he posits that the drugs are not safe and

12   effective, the question is who answers that question, and the

13   statute clearly delegates that responsibility to the FDA.

14           It's hard to know what Mr. Strange would say the

15   preemption statute means, what does it preempt.  It's sort of

16   hard to know what meaning it would have under his construction

17   of it.

18           Clearly, when they were making a blanket attack on

19   the safety and efficacy of the drugs independent of a claim of

20   injury, just strictly, "We say they don't work and they are not

21   safe," when the FDA has said exactly the opposite, that has to

22   be preempted under 379r.

23           They would posit a preemption system not governed

24   by -- grounded in the supremacy clause but by Rule 11 that any

25   plaintiff -- under his theory, even if the FDA held a hearing
```

```
 1    and said, "You know, we don't agree" --

 2              THE COURT:  That's right.

 3              MR. STRANGE:  -- then under Rule 11, if a plaintiff

 4    came back and said, "Well, I disagree.  I can sue," that's not

 5    our system, at least where there is not an allegation of

 6    personal injury.

 7              Very quickly, the Tucker case, the Paxil case that he

 8    cites, if Your Honor would look at the section that's cited

 9    there -- it's 21CFR 201.80 -- it clearly, by its own terms,

10    applies only to prescription drugs and biologics.  It doesn't

11    even apply to --

12              THE COURT:  Well, but since I had a thousand Paxil

13    cases, I know that.

14              MR. AUSTIN:  The savings clause, I will simply note

15    they cite Blacks Law Dictionary, which says, "Products

16    liability claims can include breach of warranty claims," but

17    they neglected to cite another section of Blacks that says,

18    "Products liability claims have to be for injuries."

19              So, in other words, could there be a warranty claim

20    that's for a personal injury?  Sure there could, but that's not

21    what's being alleged here.

22              And I would point out that the Kanter case, the

23    California case that has applied 379r in this similar

24    situation, preempted expressed warranty claims as well.

25              The New Jersey statute, which is the common fraud
```

1     statute on which all of these claims are based -- they actually

2     are suing all of the defendants under the New Jersey statute --

3     it expressly excludes warranty claims from the definition of

4     product liability claim.

5             I think Your Honor has hit the nail on the head.

6     It's hard to know what we're being -- what we're supposed to

7     have done.

8             I think this is an example of the FDA actually doing

9     what it's supposed to do.  There was a citizens' petition.  The

10    FDA is looking at this issue.  They may come out in the future

11    with some other findings, and as it stands right now, there's

12    been no final ruling even for under two, but we voluntarily

13    acted.

14            THE COURT:  Well, let's test this for a minute.  The

15    Novartis people could certainly -- if they had a sufficient

16    reason to do it, could certainly go to the FDA and say, "We

17    want to change our label."

18            MR. AUSTIN:  Correct.

19            THE COURT:  And then what the FDA would do -- would

20    you have to go to them to change your label?

21            MR. AUSTIN:  Under the OTC monograph process, there

22    is actually a provision that requires you to file a petition

23    with the FDA.  It can be us or it can be someone else.  It

24    could be Mr. Strange.

25            THE COURT:  That's right.

1          Well, I thought I knew the answer when I asked the

2  question.

3          MR. AUSTIN:  It's that process that has prompted the

4  FDA to look at this issue now.  It's because of a citizens'

5  petition, so -- I mean, in some instances of preemption, you're

6  dealing with an agency that's never done anything.  This issue

7  is under review by the FDA.

8          THE COURT:  Well, everything's under review by the

9  FDA all the time.

10         MR. AUSTIN:  I guess this one they are particularly

11 active on at present.  And there's really no reason to strip

12 that responsibility from them and turn it over to individual

13 plaintiffs outside the product liability context.

14         The construction we're advocating for the statute

15 gives the FDA the freedom that they need to regulate the

16 products broadly, but it carves out a product liability

17 exception for plaintiffs who are alleging an injury.

18         Their interpretation really gives the statute no

19 meaning.

20         THE COURT:  All right.  Is that it from you?

21         MR. AUSTIN:  That's it.

22         THE COURT:  Please?  Anything else.

23         MR. STRANGE:  No, Your Honor.

24         MR. HANRAHAN:  Your Honor, Thomas Hanrahan for McNeil

25 in the Kotler case.  Just one observation -- and if I can speak

1    from here, is that all right, Your Honor?

2         THE COURT:  Well, she can do this better if you go

3    over there (indicating).

4         THE REPORTER:  Thank you.

5         MR. HANRAHAN:  Just one observation about the

6    warranty argument, Your Honor.

7         Mr. Strange cited the Cipollone case.  There is

8    similar discussion about the warranty claim in the Bates case

9    from the Supreme Court.

10        In both of those, the Court goes out of its way to

11   stress that the warranty made there in those cases was

12   something well beyond the labeling for the product beyond what

13   was -- on the cigarette package and beyond what was on the

14   labeling for the insecticide in Bates.

15        This is not that kind of case.

16        In this case -- and you can look at the Kotler

17   complaint.  Look at Paragraph 18 and 37 and 38 -- the so-called

18   warranty here is nothing more than what the FDA says the

19   labeling has to say.

20        In effect, the plaintiffs' warranty argument is the

21   FDA said, "Here's what the labeling says.  The labeling is a de

22   facto warranty, and then what the FDA said about the safety and

23   effectiveness of these medicines is not true, therefore, in

24   selling it, you have breached your warranty."

25        That's a flat head-on clash with the FDA safety and

```
1    effectiveness findings.  It is not the kind of warranty
2    addressed in Cipollone or Bates.
3              THE COURT:  Now, let's go over that again.
4              MR. HANRAHAN:  Sure.
5              THE COURT:  Do it again.
6              MR. HANRAHAN:  The argument that Mr. Strange makes
7    about the warranty is he says, "Look, the warranty is not
8    covered by the scope of requirements.  That term --
9              THE COURT:  That's right.
10             MR. HANRAHAN:  -- as used in the statute, you know,
11   the statute in this case and the statute in Riegel or
12   Cipollone, or in Bates for that matter.
13             That argument rested in Justice Stevens' view on the
14   notion that a manufacturer is not compelled by the state to
15   issue a warranty at all.  We are talking only about expressed
16   warranties here.  That a manufacturer voluntarily does that
17   and, therefore --
18             THE COURT:  Of course.
19             MR. AUSTIN:  -- liability that attaches to a
20   voluntary act is not a state requirement.
21             THE COURT:  Yes, we do agree.
22             MR. HANRAHAN:  All right.  Then I don't need to go
23   further, Your Honor.
24             THE COURT:  No.  I understand.  Anything else?
25             MR. STRANGE:  Your Honor, can I respond briefly?
```

```
 1              THE COURT:  If you want to, certainly.

 2              MR. STRANGE:  With respect to whose obligation or

 3   responsibility is it to strengthen the label, the defendants --

 4              THE COURT:  It's --

 5              MR. STRANGE:  To change a label.

 6              THE COURT:  Um-hmm.

 7              MR. STRANGE:  The defendants have told you -- and

 8   this is their position -- that that's the FDA's responsibility

 9   because that's their argument, and that's what they just told

10   you.

11              THE COURT:  Well, they are -- all right.  Go on.

12              MR. STRANGE:  All right.  And that's the exact

13   argument that I submit Your Honor should reject and was

14   rejected by the Tucker court.

15              And what the Tucker court said was the ongoing

16   ability, authority, and responsibility to strengthen a label

17   still rests squarely with the drug manufacturer.

18              So if you have a situation where a drug manufacturer

19   finds out that there is a serious hazard with a drug that they

20   are selling with children --

21              THE COURT:  You know, you put an adjective in there

22   which throws me off.

23              MR. STRANGE:  Okay.

24              THE COURT:  And that's the word serious.

25              I would rather give you a hypothetical that goes like
```

 1    this -- because it's more likely that it would be operative.

 2              MR. STRANGE:  Okay.

 3              THE COURT:  And that is that there is disagreement in

 4    the field about whether something is safe and effective.

 5    That's why you would be going to a jury because there is

 6    disagreement about that.

 7              Now, in the face of that, the manufacturer, you say,

 8    would -- as soon as he knows, as soon as the manufacturer knows

 9    something about that outside complaint, the manufacturer must

10    go to the shelves, pull everything down and change the label.

11    That's what you said.

12              MR. STRANGE:  I'm not alleging that.

13              THE COURT:  Or take the risk of having to pay back

14    all the money.

15              MR. STRANGE:  I don't know about pulling everything

16    down.  I'd have to think about that.

17              THE COURT:  Why?  Well, you can't leave it there.

18              MR. STRANGE:  Perhaps.  But, clearly, what I am

19    saying is on a going-forward basis, they have an obligation to

20    strengthen their label.  And if they don't, then -- and it

21    turns out that there was a serious hazard with this drug, they

22    have to pay back the money they made.  That's exactly what I'm

23    saying.

24              THE COURT:  Well, the things that are on the shelf

25    are the things that produce the revenue for the manufacturer.

```
 1              If they don't take those things off, according to

 2    you, they owe all the money back.

 3              MR. STRANGE:  I'd have to think about taking them

 4    off.  It's throwing me off a little bit.

 5              THE COURT:  Why?

 6              MR. STRANGE:  Because I'm talking about changing the

 7    label.  That label is already there, and it was sold at a time

 8    when they didn't know.

 9              THE COURT:  Well, but you have to think about that

10    because the Court has to think about it.

11              MR. STRANGE:  But the distinction I would make is

12    this, Your Honor, is the product that's on the shelf, they

13    didn't know, under the hypothetical, that it was dangerous, and

14    what I'm --

15              THE COURT:  The product on the shelf, they didn't

16    know it was dangerous.

17              MR. STRANGE:  Right.  What I am saying is --

18              THE COURT:  But you're --

19              MR. STRANGE:  -- at a given point in time when they

20    find out that the drug is dangerous, there's product already on

21    the shelf that was already put out there before they knew that

22    fact.

23              THE COURT:  That's what I said.

24              MR. STRANGE:  Yeah, and so I don't see them having to

25    pay that money back, but I'm saying on a going-forward basis
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   that they have an obligation to change the label.

2           THE COURT:  Well, you perplex me because your client

3   went to the shelf and bought something that was on the shelf.

4   And presumably at the time they put it on the shelf, they

5   didn't know anything about the problem.

6           MR. STRANGE:  No, I'm alleging they did, that they

7   did know something about it at the time it was on the shelf

8   when my client purchased it.

9           If they didn't, I wouldn't have a case.  That's what

10  I'm -- my whole case is that they knew that this drug that my

11  client was purchasing was not safe and, in fact, didn't work.

12          THE COURT:  You produce a difficult situation.

13          So if a box arrived in a pharmacy labeled -- and had

14  the same label as the things on the shelf, and then we have to

15  look at every box to see whether it was a box that was labeled

16  when they knew?

17          MR. STRANGE:  That's the key issue.  The key issue is

18  when they knew.

19          THE COURT:  Warranty makes a sort of botch out of

20  your enforcement notion.

21          Let me ask you, you asked for an injunction.  What

22  does your injunction say?

23          MR. STRANGE:  Your Honor, I think that it would be

24  difficult in this case to have the Court issue an injunction.

25          THE COURT:  Might be impossible.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. STRANGE:  Yeah, I agree with you.

 2              THE COURT:  Now, then my last question is let's go to

 3    the question of 9(b).

 4              MR. STRANGE:  Yes.

 5              THE COURT:  You really would not care at all about

 6    the issue of reliance, would you?  You'd say that your client's

 7    knowledge and reliance would not be relevant here.

 8              MR. STRANGE:  No, I think it would be relevant, but I

 9    think there would be a presumption of reliance under the

10    Velasquez analysis.

11              THE COURT:  Under what?

12              MR. STRANGE:  Under the state court case called

13    Velasquez which basically said in certain situations, there's a

14    presumption of reliance and that that's more in a class

15    certification issue.

16              But when something is so fundamental that someone

17    must have relied on it, there's a presumption of reliance.

18              Like, for example, would a parent of a child buy a

19    cough medicine if they knew it was dangerous and didn't work?

20    I think there's a presumption that they relied on the fact that

21    it would work and wasn't dangerous or they wouldn't have bought

22    it.

23              But with respect to 9(b), Your Honor --

24              THE COURT:  They don't really say that, do they?

25              MR. STRANGE:  No, they don't.  And with respect to
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   9(b), I think I would request, respectfully, that we be allowed

2   to amend because I think we can do a better job on that.

3           THE COURT:  You'd require that the manufacturer knew

4   it was not safe or effective, and you would require that the

5   plaintiff did not know that the drug was not safe and

6   effective?

7           MR. STRANGE:  Yes, Your Honor.

8           THE COURT:  Well, that's not in your complaint.

9           MR. STRANGE:  Your Honor, I think it's not the model

10  pleading, but with respect, I would request leave to amend

11  because that is our case.

12          THE COURT:  Well, what would you want to amend?  The

13  warranty claims or under 9(b)?

14          MR. STRANGE:  Both.  But with respect to the

15  warranty, I think we have alleged warranties.  Like, for

16  instance, we quote from the website.  In the Kotler case, I'm

17  looking at, which is different, the allegations there are

18  different than the labels, as far as I can tell.  So we would

19  allege warranties that are separate and apart from the label.

20          THE COURT:  You would?

21          MR. STRANGE:  Yes.

22          And, second of all, we would, I think, shore up the

23  complaint with respect to the 9(b) allegations.

24          THE COURT:  Well, what do you all say about that on

25  the defense side?  I'm not trying to make this into the mystery

```
 1   hour.  I'm just trying to understand.

 2          MR. HANRAHAN:  Your Honor, this is Thomas Hanrahan

 3   for McNeil.

 4          I think the answer to your direct question about what

 5   we make about amending to deal with the warranty and more

 6   elaborate --

 7          THE COURT:  That's what I'm asking you.

 8          MR. HANRAHAN:  -- specifications, I don't know that

 9   the plaintiffs can amend the complaint on the theory that they

10   have brought here.

11          THE COURT:  The theory here is warranty.

12          MR. HANRAHAN:  Well, let me be a little more precise

13   about what I had in mind when I use that word.

14          The complaint here alleges and the warranty

15   allegations themselves allege that these medicines kind of

16   across the board, and without specification of detail or why,

17   are unsafe and, as Mr. Strange has said several times today,

18   they don't work.  Period.  Period.

19          New chapter.  Okay.  Put that on one side of the

20   board.  On the other side of the board, look at what the FDA

21   says.  The FDA says, "Mr. Strange and the rest of the world,

22   these medicines are safe and they are effective" --

23          THE COURT:  That's right.

24          MR. HANRAHAN:  -- "when used for the indications

25   approved and when used at the dosage levels recommended."
```

```
 1                 THE COURT:  Right.

 2                 MR. HANRAHAN:  "And you manufacturers can market

 3      those to the public so long as you say exactly what the

 4      regulations say in terms of indications, dosage, et cetera."

 5                 THE COURT:  They always do that.

 6                 MR. HANRAHAN:  Right.  And that's what we do.  And

 7      there's no allegation that we haven't done that.

 8                 Then you come to the warranty issue.  And, as I said

 9      before, in the Supreme Court cases that have kind of carved

10      that out from the requirements scope, those warranties have

11      been fairly explicit.  And, in fact, if you look at the Bates

12      case, the warranty there is very explicit.  It looks like any

13      other warranty.  It says manufacturer warrants that this will

14      do thus and such.  Okay.  This is not that case.

15                 The reason that is not this case is because the

16      plaintiffs here allege that the drugs are unsafe and

17      ineffective.

18                 And if you look, for example -- I'll deal with the

19      Kotler case because that's the one that Mr. Strange has with

20      him.  In Paragraph 18, they say, "Many of defendants' products

21      specifically state they are for," quote, "children," period.

22      "This alone warrants both expressly and impliedly that the

23      medicines are safe and effective for children."

24                 Then it says, "They list a dosage amount for children

25      between the ages of two and five, expressly and impliedly
```

1    warranting that the medications are safe and effective for

2    children of these ages."

3           And then they go to Paragraph 20.  They say, "There

4    are expressed and implied warranties that the products are safe

5    and effective for children.  For example" -- and as examples of

6    those warranties that they are safe and effective for children,

7    they cite a couple of relatively nondescript excerpts from some

8    information on the website.

9           The point of that is that the warranty isn't that

10   this will, you know, cure baldness or it will make you taller,

11   faster and able to dunk over Kobe Bryant or something like

12   that.  The warranty is that it's safe and effective.

13          The plaintiff cannot bring a warranty claim that

14   cures that in a way that overcomes the statutory preemption.

15          If they have a different kind of warranty claim that

16   is divorced from safety and effectiveness, maybe they can do

17   that.  You know, lawyers are an imaginative breed.  I don't

18   know what they might say in that regard.

19          I do take some instruction from Mr. Strange's comment

20   and Your Honor's endorsement that he could not really ask for

21   an injunction in this case.

22          And I think that's worth pausing for a moment about

23   that because one of the observations that is worth noting is

24   that no matter what happens in this case, these medicines don't

25   go off the market.  You know, these are the same medicines that

1    are there for use for persons over six, seven to 12, and

2    adults.  The medicines don't go off the market.

3         What Mr. Strange asked for when he wrote the

4    complaint, and what he surely had in mind when he asked for

5    injunctive relief, was an order that says, "You have to put in

6    your label that these medicines are not safe and not effective

7    for children under six."  That's what the complaint is all

8    about.

9         THE COURT:  That is what he means.

10        MR. HANRAHAN:  Right.  And the reason he can't do

11   that -- and I suspect the reason Your Honor said it would be

12   impossible to do that is because the FDA has said these

13   medicines are safe and they are effective.

14        THE COURT:  That is why I said that.

15        MR. HANRAHAN:  And if you then circle back to whether

16   he can amend on a warranty theory, I suggest to Your Honor that

17   he can't amend his warranty claim and retain this not-safe and

18   not-effective notion, however it's phrased and however it's

19   articulated.  If that continues to be the crux of the case, you

20   know, we're wasting our time on amendment.

21        Whether he can come up with something more elaborate

22   in what Mr. Kotler saw or what Mr. Ostergard saw or any of

23   those other folks and make some different kind of case that is

24   different from a safety and effectiveness challenge, I don't

25   know.  You know, I certainly wouldn't preclude that

1    possibility, but I don't know.

2         THE COURT:  I have got a safety and effectiveness

3    complaint in front of me, and you are quite right that was the

4    point of my questioning.

5         MR. HANRAHAN:  I don't know whether he can amend or

6    not, Your Honor, but he certainly can't amend a safety and

7    effectiveness complaint.

8         MR. STRANGE:  Your Honor, can I respond?

9         THE COURT:  Yes, you can.

10        Now, you can believe me when I say we're not just

11   talking to each other in order to be sure that you all can make

12   an argument.  I really am quite concerned about what your

13   theory is.

14        MR. STRANGE:  Your Honor, as Your Honor knows,

15   warranty claims are not based solely on the manufacturer

16   warrants X, Y and Z.

17        THE COURT:  Well, let me tell you that generalities

18   won't help me now.  If you are going to allege something

19   totally different than what you have in the complaint, just

20   share it with me.

21        MR. STRANGE:  Well, let me give you an example of

22   what's in the complaint which I think we can expand on.

23        Like, for instance, Paragraph 20 is -- under our

24   warranties in the Kotler case, the defendant says, "PediaCare

25   Children's Long-acting Cough effectively relieves your child's

1    cough symptoms for up to eight hours without drowsiness."

2              We think that sentence is false and that that wasn't

3    approved as language that the FDA said that they could use,

4    so --

5              THE COURT:  Well, I didn't know anything about that.

6              MR. STRANGE:  It's in our complaint, Paragraph --

7              THE COURT:  Well, I know, but that is not -- is that

8    a warranty?

9              MR. STRANGE:  Absolutely.

10             THE COURT:  Oh.

11             MR. STRANGE:  And that's just an example.  And we

12   think we can cite to other warranties that they made in their

13   advertisement with respect to these drugs which was not

14   specifically approved by the FDA.

15             THE COURT:  Well, you can't advertise drugs without

16   the approval of the FDA.  You can't do that.

17             MR. STRANGE:  Well, we don't think the defendant had

18   the approval of the FDA for that representation, and we're

19   happy to allege that.  But those are the kinds of warranties

20   that we would amend to make it clear, Your Honor.

21             THE COURT:  Well, what you mean is you want to amend

22   and you want to think it over and amend however you want to

23   amend?

24             MR. STRANGE:  Yes, Your Honor.

25             THE COURT:  Well --

1        Please.

2            MR. HANRAHAN:  Thomas Hanrahan.  Very, very briefly

3    on the eight hours.  That's not going to cut it either.  And

4    the reason that doesn't cut it either is because that is

5    specifically addressed in the regulations, and it's at 21 CFR

6    341.74(d)(1)(iii).

7            And what it says is -- it sets out the dosage for

8    children.  It says, quote, "Children two to under six years of

9    age," colon, "Oral dosage is 2.5 to 5 milligrams every four

10   hours or 7-and-a-half milligrams every six to eight hours."

11           Now, keep in mind that the premise -- the underlying

12   premise for these regulations are that the medicines are

13   effective.  They work when used as directed.

14           And here you have a specific illustration of that

15   general conclusion, general finding, that when used at that

16   dosage, seven-and-a-half milligrams, that it will work for six

17   to eight hours.  That's what the FDA said.

18           There's nothing wrong with saying that in your

19   advertising.  So that's not going to fix it.  I think

20   Mr. Strange has a lot of work to do if he is going to try to

21   get around the regulatory findings about these medications.

22           THE COURT:  What you're talking about, Mr. Strange,

23   is amending to change the theory, and what I was talking about

24   was amending to make it more specific.

25           MR. STRANGE:  Your Honor, I may have misspoke.  I was

```
 1   agreeing with Your Honor, which is that we would amend to make

 2   more specific the warranty claims outside the labeling.

 3            THE COURT:  Outside the labeling?

 4            MR. STRANGE:  Yes.

 5            THE COURT:  All right.  Now we've exchanged views.

 6   Is there anything else?

 7            MR. AUSTIN:  Nothing here.

 8            MR. HANRAHAN:  No, Your Honor.

 9            THE COURT:  All right.  So it's submitted.  Thank

10   you.

11            MR. AUSTIN:  Thank you, Your Honor.

12       (Proceedings concluded.)

13                        --oOo--

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA